**IN THE UNITED STATES DISTRICT COURT FOR**
**THE MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| **NANCY GUENTHER,** *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | **Case No. 6:08-cv-456-Orl-31DAB** |
| v. ) | |
| ) | |
| **NOVARTIS PHARMACEUTICALS CORP.,** ) | |
| ) | |
| Defendant. ) | |

**NOVARTIS PHARMACEUTICALS CORPORATION'S MOTION *IN LIMINE***

Pursuant to this Court's July 24, 2013 Order (ECF No. 156) and Rules 401-03 and Rule 407 of the Federal Rules of Evidence, Novartis Pharmaceuticals Corporation ("NPC") files this omnibus motion *in limine*.[1]

**MEMORANDUM OF LAW**

**I.      The Court Should Exclude Evidence And Arguments Regarding Certain Alleged "Notice" Issues That Are Irrelevant And Inadmissible Based On Rule 403.**

Nancy Guenther started her Zometa® therapy in May 2002, long before: (a) the first case reports of osteonecrosis of the jaw ("ONJ") occurring in patients treated with Zometa® or other bisphosphonates were published in September 2003; and (b) NPC revised the Zometa® package insert in September 2003 to inform prescribing physicians about ONJ. Thus, to satisfy their burden of proving that the Zometa® package insert was inadequate when Mrs. Guenther started Zometa® in May 2002, plaintiffs have cobbled together a case that purports to show that NPC knew or should have known about ONJ before May 2002.

---

[1] Pursuant to Local Rule 3.01(g), NPC's counsel conferred with plaintiffs' counsel in a good faith effort to resolve the issues raised herein, but counsel did not reach agreement.

However, certain "notice" evidence should be excluded because it is irrelevant, Fed. R. Evid. 401-02, or, in the alternative, because the minimal probative value of such evidence is substantially outweighed by the dangers of unfair prejudice, confusing the issues, misleading the jury, and wasting time, Fed. R. Evid. 403.

A. Rat Study Published in 1981

The Court should exclude any evidence or argument about a rat study published in 1981 by Gotcher and Jee ("Gotcher and Jee Article").[2]  This study is inadmissible because it is very far removed – both temporally and, as shown by the testimony of plaintiffs' main expert witness (Dr. Robert Marx), scientifically – from the issues presented in this case.  The Gotcher and Jee Article is irrelevant or, in the alternative, its minimal probative value is substantially outweighed by the significant risk that the article will unfairly prejudice NPC and mislead and confuse the jury, Rule  403.  This Court (per Senior Judge Adams), in the *Chiles* Zometa® trial, and courts presiding over other Zometa® trials recently have excluded the Gotcher and Jee Article.[3]  This Court should make the same exclusion ruling.

The Gotcher and Jee Article is a 1981 report about an experiment in rice rats (a species bred as a model to study periodontal disease) in which the drug clodronate was tested to see if it would reduce periodontal bone loss in the rats.  It did.  The rats in the study developed rampant periodontal disease when fed a sugared diet (as was intended); the clodronate made this somewhat better.  Gotcher and Jee Article at 441, 451-52.  In addition

---

[2] J.E. Gotcher & W.S.S. Jee, *The progress of the periodontal syndrome in the rice rat II: The effects of diphosphonate on the periodontum*, 1981 J. Periodontal Res. 16(4): 441-55 (Ex. 1).

[3] *See* 2/13/2013 Trial Tr. at 102-04, *Chiles v. NPC*, No. 3:06-cv-00096-HLA-JBT (M.D. Fla.) (Ex. 2); *see also* 6/11/2013 Trial Tr. (rough) at 102-05, *Hill v. NPC*, No. 1:06-CV-00939 (E.D. Cal.) (Ex. 3); 10/3/2012 Trial Tr. at 42, *Davids v. NPC*, 2:06-cv-0431-ADS (E.D.N.Y.) (Ex. 4).

to the periodontal disease, some rats had exposed jaw bone.

Plaintiffs will try to use this rat study to argue that it was a "signal" that should have placed NPC on notice that Zometa® (and/or Aredia®) could cause ONJ, but that argument has no merit because there is no reasonable basis to construe the article to suggest that Zometa® (and/or Aredia®) could cause ONJ. The first problem with any suggestion that the Gotcher and Jee Article should have placed NPC on notice that Zometa® (and/or Aredia®) can cause ONJ is that this rat study did not involve Zometa® or even Aredia®. This study involved clodronate, a different bisphosphonate drug. Evidence that one chemical can cause a certain effect is not a reliable basis to conclude that other chemicals – even in the same class – can cause the same effect.[4]

In fact, the testimony from plaintiffs' expert Dr. Robert Marx is ***not*** that Aredia® and Zometa® "act just like" other bisphosphonates like clodronate, but that they are ***completely different*** with regard to ONJ. Bisphosphonates are divided into two groups: nitrogen-containing (like Aredia® and Zometa®), and non-nitrogen-containing (like clodronate). Dr. Marx – plaintiffs' main expert regarding whether Zometa® causes ONJ – testified that he is "a hundred percent" sure that ONJ is caused ***only*** by nitrogen-containing bisphosphonates. 5/18/2007 Marx Dep. Tr. at 680 (Ex. 5).

Moreover, the Gotcher and Jee Article is not relevant to plaintiffs' notice argument because this rat study is not a reliable model for determining whether Zometa® (or Aredia®) could cause ONJ in humans with breast cancer that has metastasized to bone. Plaintiffs

---

[4] *See, e.g., Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1200-01 (11th Cir. 2002) (affirming exclusion of proffered evidence regarding drugs in the same chemical class because it was primarily based on "speculation and conjecture"), *reh'g en banc denied*, 48 F. App'x 330 (11th Cir. 2002).

cannot extrapolate the findings of this rat study to humans unless they can prove that there is a reliable scientific basis for such extrapolation.[5]  But Dr. Marx's own testimony precludes them from making the requisite showing that there is a scientifically reliable connection between the Gotcher and Jee Article and ONJ in humans with metastatic breast cancer.  Dr. Marx agreed that he "can't say that the Gotcher study is even a reliable indicator or a reliable model for testing for osteonecrosis of the jaw with bisphosphonates."  3/21/2012 Marx Tr. Test. at 105, *Winter v. NPC*, No. 06-4049-CV-C-MJW (W.D. Mo.) (Ex. 6).

Even if the Court concludes that the Gotcher and Jee Article is relevant, the article should be excluded under Rule 403.  Given the testimony by plaintiffs' expert Dr. Marx cited above, the findings reported in the Gotcher and Jee Article are so far removed scientifically from the issues that the jury will be required to evaluate that this article will confuse and mislead the jury.  Moreover, the argument that this rat study should have put NPC on notice in the 1980's that Zometa® could cause ONJ in humans is unfairly prejudicial to NPC because neither Dr. Marx nor anybody else who published in the voluminous medical/scientific literature regarding bisphosphonates even suggested that the Gotcher and Jee Article should be viewed as evidence of a link between ONJ and Zometa®.

If the Court does not exclude the Gotcher and Jee Article, then NPC will need to present time-consuming evidence about why that rat study did not put NPC on notice of a link between ONJ and Zometa®.  The Court should avoid this "mini-trial" about this

---

[5] *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (relying on studies showing one type of cancer in mice to establish causation of another type of cancer in humans is "simply too great an analytical gap between the data and the opinion proffered"); *Siharath v. Sandoz Pharm. Corp.*, 131 F. Supp. 2d 1347, 1366 (N.D. Ga. 2001) ("Extrapolations from animal studies to human beings are generally not considered reliable in the absence of a credible scientific explanation of why such extrapolation is warranted."), *aff'd sub nom. Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194 (11th Cir. 2002).

irrelevant, collateral issue by excluding evidence and argument about this rat study.

      B.  <u>Nineteenth-Century Industrial Disease Known as "Phossy Jaw"</u>

Phossy jaw was a nineteenth-century industrial disease affecting match factory workers exposed to white phosphorus – a reactive material that would burn when exposed to oxygen.  By contrast, bisphosphonate drugs are stable compounds that are not metabolized in the body.  White phosphorus is not related to bisphosphonate drugs like Zometa®.  White phosphorus and Zometa® are chemically distinct substances with distinct properties.

Given the substantial differences between white phosphorus and Zometa®, evidence about phossy jaw is irrelevant.  Plaintiffs cannot satisfy their burden of showing a link between that 19th-century industrial disease and ONJ in patients treated with Zometa® that should have put NPC on notice that Zometa® could cause ONJ.  Thus, the Court should exclude evidence and argument about phossy jaw.

Even if phossy jaw is relevant, its slight probative value is substantially outweighed by Rule 403 concerns – misleading and confusing the jury, wasting time, and causing unfair prejudice to NPC.  In another Zometa® lawsuit and in a lawsuit involving an oral bisphosphonate drug, federal courts have excluded phossy jaw evidence on those grounds.[6]

Finally, this Court has ordered that "[e]xpert testimony on direct examination at trial will be limited to the opinions, bases, reasons, data, and other information disclosed in the written expert report."  Case Management and Scheduling Order at 4 (ECF No. 37).  Dr. Marx's expert report, which was served on NPC in this lawsuit, does not address phossy jaw.

---

[6] *See* 1/12/2012 Trial Tr. at 70, *Kyle v. NPC*, No. 1:06-cv-00035 (W.D. Ky.) (excluding evidence about phossy jaw because it "has a minute amount of probative value" that is outweighed by its prejudicial effect, including jury confusion) (Ex. 7); *see also In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 198 (S.D.N.Y. 2009).

Thus, even if the Court does not exclude all phossy jaw evidence, the Court should preclude Dr. Marx from testifying about phossy jaw.

      C.  <u>Genetic Disorder Osteopetrosis</u>

Osteopetrosis is a genetic disorder that affects every bone in the skeleton and causes a variety of serious medical conditions.  Because osteopetrosis typically impairs the normal functioning of osteoclasts, because Zometa® also inhibits osteoclasts – though by a different mechanism – and because some types of osteopetrosis bring about osteomyelitis of the jaw, plaintiffs will argue that NPC should have known that Zometa® could cause ONJ.

However, plaintiffs' expert Dr. Parisian concedes that osteopetrosis and ONJ are totally different disease processes:

> Q.  Now, osteopetrosis is a very different disease process or entity than osteonecrosis of the jaw, isn't it?
> A.  Well, ***they are two different disease processes.***  One is -- osteonecrosis of the jaw is a symptom complex, whereas osteopetrosis is a genetic condition.  ***So they are totally different***.

2/13/13 Trial Tr. at 144-45, *Chiles v. NPC*, No. 3:06-cv-00096-J-25-JBT (M.D. Fla.) (emphasis added) (Ex. 2).  Thus, osteopetrosis evidence is irrelevant.

Even if the Court holds that osteopetrosis evidence is relevant, the Court should exclude such evidence under Rule 403 because plaintiffs' convoluted theories about osteopetrosis will confuse the jury and unfairly prejudice NPC.  Federal courts presiding over other Zometa® cases have excluded testimony about osteopetrosis on these grounds.[7]  This Court should do so as well.

II.     **The Court Should Exclude Evidence And Arguments Regarding Certain Issues Controlled By The Food And Drug Administration ("FDA").**

The Court should exclude evidence and arguments regarding certain labeling, dosing, and regulatory reporting issues that, under Supreme Court precedent and federal statute, are preempted because they conflict with the FDA's regulatory authority over the marketing of prescription drugs and cannot form the basis of a private civil action.  In *Mutual Pharm. Co. v. Bartlett*, 133 S. Ct. 2466 (2013), the Supreme Court re-affirmed what it had previously made clear, namely that a tort plaintiff cannot pursue state law claims premised on labeling changes that a drug manufacturer is prohibited from making under federal law absent prior FDA approval.[8]  Based on *Bartlett* and other reasons discussed below, the Court should preclude evidence and arguments about certain issues that are controlled by the FDA.

A.  "Black Box" Warning

NPC expects that plaintiffs will try to argue that NPC failed to provide adequate warnings about ONJ because NPC did not add a "black box" warning to the Zometa® label (also known as a "package insert").  A black box warning is a bolded statement with the heading "WARNING" that appears at the beginning of the label within a black box.[9] Although case reports about ONJ in patients treated with Zometa® and other bisphosphonates

---

[7] *See* 10/3/12 Hr'g Tr. at 41-42, *Davids v. NPC*, No. 06-CV-0431 (E.D.N.Y.) (Ex. 4); 6/11/13 Trial Tr. (rough) at 102-05, *Hill v. NPC*, No. 1:06-CV-00939 (E.D. Cal.) (Ex. 3).

[8] *See also PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567 (2011) (federal law preempts claims that a drug company should have given a warning if the company could not add it to the label without prior FDA approval); *Pom Wonderful LLC v. Coca-Cola Co.*, 679 F.3d 1170 (9th Cir. 2012) (21 U.S.C. § 337(a) and FDA's primary jurisdiction preclude direct and indirect challenges to FDA's labeling judgments); *Marsh v. Genentech, Inc.*, 693 F.3d 546, 552-54 (6th Cir. 2012) (FDA's primary jurisdiction and 21 C.F.R. § 314.80 and 21 C.F.R. § 314.81's post-marketing requirements and FDA's elucidated power to withdraw approval of a drug based on a failure to submit reports preclude direct and indirect challenges to FDA's reporting judgments).

[9] *See* 21 C.F.R. § 201.57(a)(4), (c)(1).  Such a warning must "ordinarily be based on clinical data, but serious

started appearing in medical journals about a decade ago, the FDA has never required NPC to add a black box warning about ONJ to the Zometa® (or Aredia®) label.

The Court should preclude evidence and argument about a black box warning because FDA regulations prohibited NPC from including such a warning without the FDA's prior approval[10] – and because plaintiffs have no evidence to show that the FDA would have approved a black box ONJ warning for Zometa®.  The FDA has explained that it retains exclusive control as to whether and when a black box warning may be added because "[t]he intent of the box is to draw special attention to the warning" and it exercises "restraint in requiring warnings to be boxed because overuse of the box will ultimately lead to reducing its effect."  51 Fed. Reg. 43900-01, 43902 (Dec. 5, 1986).  The FDA's consistently expressed position that a manufacturer cannot unilaterally add a black box warning must control here.[11]

In *Bartlett*, the Supreme Court made clear that *Mensing*'s reasoning is equally applicable to potential labeling changes by name-brand pharmaceutical manufacturers which require prior FDA approval.  *See Bartlett*, 133 S. Ct. at 2471.  Although *Bartlett* involved a claim brought against the manufacturer of a generic drug, the Court went out of its way to extend its reasoning to labeling claims involving brand-name drugs as well, explaining that "[o]nce a drug – *whether generic or brand-name* – is approved, the manufacturer is prohibited from making any changes to the qualitative or quantitative formulation of the drug

---

animal toxicity may also be the basis for a boxed warning in the absence of clinical data."  *Id.* § 201.57(c)(1).

[10] In response to public rule-making comments that asked if a manufacturer could put a black box warning on a drug label without prior FDA approval, the FDA stated that a manufacturer could not do so.  *See* 44 Fed. Reg. 37434, 37448 (June 26, 1979).

[11] *See Mensing*, 131 S. Ct. at 2575 ("The FDA's views are controlling unless plainly erroneous or inconsistent with the regulation[s] or there is any other reason to doubt that they reflect the FDA's fair and considered judgment.") (quotation marks omitted).

product, including active ingredients, or in the specifications provided in the approved application.'"  *Id.* (emphasis added).

Adding a black box warning to the Zometa® label falls squarely within this category.[12]  Because preemption principles prevent plaintiffs from presenting any evidence or argument to suggest that NPC should have added a black box warning to the Zometa® label, this Court should exclude such evidence and argument.

   B.  Labeling Changes Involving Dosing/Duration of Use and Comparisons Between
       Zometa® and Aredia®

NPC expects that plaintiffs will try to present evidence and argument that NPC should have changed the Zometa® label to: (a) recommend less frequent dosing than the FDA-approved dosing interval (one infusion every 3-4 weeks); and (b) suggest stopping Zometa® therapy after a certain number of doses or months of treatment.  However, plaintiffs have no evidence that Mrs. Guenther's course of Zometa® therapy was improper in terms of dosing or duration of use.

More importantly for purposes of this motion, these dosing arguments cannot support liability here because such changes to the FDA-approved dosing regimen would require prior

_____

[12] *Wyeth v. Levine*, 129 S. Ct. 1187 (2009), is not to the contrary.  The only action that NPC could have taken was to propose to the FDA that it require a black box warning.  However, as *Mensing* and *Bartlett* make clear, a manufacturer's ability to propose that the FDA take action that a manufacturer cannot take independently does not make it possible for the manufacturer to comply with both state and federal law.  "[P]re-emption analysis should not involve speculation about ways in which federal agency and third-party actions could potentially reconcile federal duties with conflicting state duties.  When the 'ordinary meaning' of federal law blocks a private party from independently accomplishing what state law requires, that party has established pre-emption."  *Mensing*, 131 S. Ct. at 2580; *see also Bartlett*, 133 S. Ct. at 2476-77 ("When federal law forbids an action that state law requires, the state law is without effect").  *Levine* addressed the FDA's "changes-being-effected" ("CBE") procedure that allows drug companies to make certain kinds of labeling changes without prior FDA approval, but the *Levine* Court did not address the circumstances presented by a black box warning – where the CBE procedure is unavailable because the FDA must pre-approve that type of label change.  *See Mensing*, 131 S. Ct. at 2581 (explaining that Court's holding in *Mensing* is consistent with its holding in *Levine* because in *Levine*, federal law accommodated the manufacturer's state law duties by allowing manufacturers to

FDA approval and therefore are preempted.  Prior FDA approval is required, *inter alia*, for any change that "has a substantial potential to have an adverse effect on the identity, strength, quality, purity or potency of the drug product as these factors may relate to the safety or effectiveness of the drug product."  21 C.F.R. § 314.70(b).  A labeling change to recommend reduced dosing or limited duration of Zometa®, as compared to the FDA-approved 3-4 week interval dosing schedule with no specified cut-off, would adversely affect the strength and potency of the drug as prescribed and could undermine the efficacy of the treatment.  Accordingly, any label change regarding dosing or duration would have been a major change under § 314.70(b) that would have required prior FDA approval.  In fact, the FDA-approved dosing regimen is so integral to the product approval that a drug company is precluded from recommending (or even suggesting) a different dosing regimen.  *See, e.g., Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 942 (7th Cir. 2001) (holding that drug company could not "recommend or even suggest" dosage level not approved by FDA).

In *Bartlett*, the Supreme Court left no question that state tort law claims premised on dosing labeling changes must be preempted.  *Bartlett* made clear that federal law prohibits such a change whether by a generic **or a brand name** drug manufacturer:  "Once a drug – whether generic *or **brand-name*** – is approved, the manufacturer is prohibited from making any major changes to the 'qualitative or ***quantitative*** formulation of the drug product, including active ingredients, or in the specifications provided in the approved application.'"  *Bartlett*, 133 S. Ct. at 2471 (quoting 21 C.F.R § 314.70(b)(2)(1)) (emphasis added).  Significantly, the Court made this statement immediately after setting forth the factors that go

---

unilaterally strengthen their labels).

into the drug's formulation, including "dosage form, strength . . . [and] rate and extent of absorption." *Id.* Thus, *Bartlett* makes clear that any changes in the dose or duration of a drug would render it a "new drug" requiring new approval by FDA: "[T]he FDCA requires a generic drug to have the same active ingredients, route of administration, dosage form, strength, and labeling as the brand-name drug on which it is based. [W]ere Mutual to change the composition of sulindac, the altered chemical would be a new drug that would require its own NDA [New Drug Application] to be marketed in interstate commerce." *Id*. at 2487. The Court cited 21 C.F.R § 310(h), which provides subsection (5) as an example of when FDA considers a drug to be a new drug, "newness of a ***dosage***, or method or ***duration of administration*** or application … even though such drug when used in other dosage, or other method or duration of administration or application, or a different condition, is not a new drug." § 310(h) (emphasis added).

Comparisons between drugs – such as plaintiffs' expected argument that NPC should have warned in its Zometa® label that Aredia® is safer than Zometa® – also require prior FDA approval. In fact, the risk of these comparisons is so great that the FDA requires that "[a]ny statements comparing the safety or effectiveness of the drug with other agents for the same indication must . . . be supported by substantial evidence derived from adequate and well-controlled studies as defined in § 314.126(b) . . . ."[13] But there are no studies, let alone

---

[13] 21 C.F.R. § 201.57(c)(7)(iii); *see* 44 Fed. Reg. 37434, 37441 (June 26, 1979) ("Comparative statements concerning safety and effectiveness must be limited to those that are derived from adequate and well-controlled studies designed for that specific purpose."); 21 C.F.R. § 202.1(e)(6)(ii) ("An advertisement for a prescription drug is false, lacking in fair balance, or otherwise misleading . . . if it . . . contains a drug comparison that represents or suggests that a drug is safer or more effective than another drug in some particular when it has not been demonstrated to be safer or more effective in such particular by substantial evidence or substantial clinical experience."); 21 C.F.R. § 314.126 (defining adequate and well-controlled studies).

any "well-controlled study data," to show that Aredia® is superior to Zometa®. Indeed, as plaintiffs' oncology expert admits, the opposite is true.[14]

In sum, because NPC could not change the Zometa® labeling, without prior FDA approval, to include the dosing warnings or comparative statements that plaintiffs claim NPC should have included under state law, those theories of liability are preempted under *Mensing* and *Bartlett*.[15] Thus, the Court should exclude evidence and argument about those issues.

C. Label Formatting Changes (Putting ONJ Information in a Different Section)

NPC expects that plaintiffs will argue that it should have formatted the Zometa® label differently by, for example, placing the ONJ warning in a different section of the label. However, this kind of argument involves another issue that is controlled by the FDA and therefore is not properly the subject of this state law personal injury lawsuit.

The FDA comprehensively regulates the formatting of prescription drug labeling. *See, e.g.*, 21 C.F.R. § 201.57(d) (setting forth formatting requirements for drug labels). The FDA's authority on that subject is plenary, as shown by the Ninth Circuit's ruling rejecting a plaintiff's claims that the FDA-approved label should have been formatted differently. *Pom Wonderful LLC v. Coca-Cola Co.*, 679 F.3d 1170, 1178 (9th Cir. 2012). The court concluded that the plaintiff's claim that defendant should have "alter[ed] the size of the words on its

---

[14] *See, e.g.*, 4/2/09 Dep. Of Dr. James Vogel Dep. at 130, *In re: Aredia & Zometa Prods. Liab. Litig.*, No. 3:06-MD-1760 (M.D. Tenn.) (plaintiffs' oncology expert agreeing that "Zometa has been more effective than Aredia in treating certain cancer patients") (Ex. 8); 4/22/13 Hr'g Tr. at 22-24, *Taylor v. NPC*, No. 06-61337-Civ-Cohn (S.D. Fla.) (Dr. Vogel admitting that he prescribes Zometa® instead of Aredia® as a matter of course and that he would not do so if he thought Aredia® were equally effective as Zometa®) (Ex. 9).

[15] In his pre-*Bartlett* opinion in the *Chiles* case, Judge Adams denied NPC's motion *in limine* on dosing, duration and comparison labeling arguments based upon the mistaken assumption that those arguments were only preempted in cases involving brand-name drugs if they were based upon fraud-on-the-FDA allegations. *See Chiles v. NPC*, No. 3:06-cv-00096-HLA-JBT, slip op. at 17-18 (M.D. Fla. Feb. 8, 2013) (Ex. 10). However, after *Bartlett*, this ruling is no longer apposite.

labeling" would "undermine the FDA's regulations and expert judgments." *Id.* at 1177.  As

the court held, "the appropriate forum for [plaintiff's] complaints is the [FDA]." *Id.*  at 1178.

In this case, plaintiffs' challenges to the FDA-approved formatting present the same

potential to undermine the FDA's considered judgments and should be precluded, including

any argument that the FDA-approved label should have placed the initial warning about ONJ

in a different section of the Zometa® label or should have used a different font size or bolded

text.  *See Hill*, 2013 WL 1953753, at *10-11 (granting NPC's motion to exclude all argument

based on formatting of Zometa® label and precluding plaintiff from arguing that "the warning

regarding ONJ [should have been] in a different section of the label, or should have utilized a

different font size or bolded text . . . [because] FDA regulations for prescription drug labeling

extend not only to content but to formatting" (citing, *inter alia*, *Pom Wonderful*)).

D.   NPC's Alleged Violations of FDA Reporting Requirements

NPC expects that plaintiffs will try to argue that NPC violated FDA regulatory

requirements by not reporting post-marketing information about ONJ to the FDA – even

though the FDA has never asserted that NPC failed to comply with reporting requirements

regarding ONJ occurring in Zometa® or Aredia® patients.  Plaintiffs should be precluded

from presenting evidence or argument about NPC's alleged failure to comply with its FDA

reporting obligations because the FDA comprehensively regulates reporting obligations of

pharmaceutical companies after their drugs are released.

Claims based upon a pharmaceutical manufacturer's failure to report post-marketing

adverse event reports and new information regarding the safety, efficacy and labeling of the

drug are preempted – *i.e.*, are constitutionally impermissible – because "[h]aving a court

determine whether any non-disclosed information may reasonably affect the statement of contraindications, warnings, precautions or adverse reactions in the [drug] labeling … would both usurp the [FDA's] role and go beyond the court's institutional expertise." *Marsh*, 693 F.3d at 553-54 (citation and quotation marks omitted).   As the *Marsh* court explained, a drug manufacturer's post-marketing reporting obligations are "inherently federal" and claims based on alleged violations of such obligations accordingly "rel[y] on federal enactments as a critical element in [the plaintiff's] case."  *Id.* at 553 (quotation marks omitted).   The court concluded that any "alleged wrong" with regard to any post-marketing disclosures "was perpetrated upon the [FDA] and thus implicates the inherently federal relationship described in *Buckman*."  *Id.* (quotation marks omitted); *see Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347, 353 (2001).[16]  Moreover, to find for the plaintiff, a court would be required to rule on the adequacy of the defendant's compliance with FDA regulations (21 C.F.R. §§ 314.80-81), but such a ruling would constitute "the kind of inter-branch meddling that concerned the Court in *Buckman*," *Marsh*, 693 F.3d at 553 (quotation marks omitted).[17]

### III.   The Court Should Exclude Evidence And Arguments That Expand The Scope Of NPC's Duty To Warn And Fail To Comport With The Learned Intermediary Doctrine.

A.  Alleged Duty To Warn About Avoiding Tooth Extractions While on Zometa® and to Recommend a Dental Examination before Starting Zometa® Treatment

NPC expects that plaintiffs will try to argue: (a) that NPC failed to provide timely,

---

[16] In other litigation, a federal court recently held that Dr. Parisian's attempts to argue about an FDA "standard of care, or standard of conduct, to the extent that such a term indicates compliance with applicable FDA regulations" are preempted.  *Block v. Woo Young Med. Co. Ltd.*, --- F. Supp. 2d ---, 2013 WL 1314449, at *13-14 (D. Minn. Mar. 28, 2013).  Dr. Parisian is plaintiffs' regulatory expert in this case as well.

[17] *See McClelland v. Medtronic Inc.*, --- F. Supp.2d ----, 2013 WL 2109965, at *6 (M.D. Fla. May 16, 2013) (holding that, to the extent negligence claim alleges that defendant breached duty owed to FDA, that claim is

adequate warnings to avoid extractions (or other invasive dental procedures) while on

Zometa® and to recommend that patients should have a dental examination before starting

Zometa® treatment; and (b) that such warnings would have prevented Mrs. Guenther from

developing ONJ.  The Court should exclude evidence and arguments about those issues

because it is undisputed that Mrs. Guenther's alleged mandibular ONJ was spontaneous –

*i.e.*, it was not preceded or triggered by an extraction or other invasive dental procedure

between May 2002 (when she began her Zometa® therapy) and October 2004 (when she was

first diagnosed with exposed bone in her mandible), as Dr. Marx admitted in his deposition.

*See* 4/25/12 Marx Dep. at 54 (agreeing that Mrs. Guenther's jaw condition was spontaneous

and not precipitated by an invasive dental procedure) (Ex. 11).  Moreover, Dr. Marx

explicitly conceded that a recommendation to obtain a pretreatment dental examination and a

warning to avoid invasive dental procedures would not have prevented Mrs. Guenther's

injury:

> Q.  An instruction to Mrs. Guenther to have avoided an invasive dental
>       procedure if possible while on Zometa would have been irrelevant to Mrs.
>       Guenther because she developed ONJ spontaneously, true?
> A.  In this case, yes.
> Q.  And furthermore, as we sit here today, you can't state to a reasonable
>       degree of medical certainty that a pretreatment dental exam would have
>       prevented Mrs. Guenther from developing ONJ, true?
> A.  That is true, yes.

*Id*. at 65-66.

Thus, plaintiffs lack the necessary evidentiary link between these alleged failures to

warn and any difference in Mrs. Guenther's outcome in terms of her alleged ONJ.  A

different or earlier warning advising Mrs. Guenther to avoid invasive dental procedures that

---

preempted); *see also Frazier v. Mylan Inc.*, 911 F. Supp. 2d 1285, 1301 (N.D. Ga. 2012).

she did not undergo in any event (or a different or earlier recommendation to undergo a pre-Zometa®-treatment dental examination that Dr. Marx cannot testify would have prevented her alleged ONJ) are irrelevant in this case because such warnings would not have led to different treatment that would have prevented the injury at issue here.  Evidence and argument about these issues should also be excluded under Rule 403 as unfairly prejudicial to NPC and confusing to the jury.

     B.  <u>Alleged Duty to Warn Dental Care Providers or Mrs. Guenther</u>

NPC expects that plaintiffs will argue that NPC had a duty to warn dental care providers and/or Mrs. Guenther directly about ONJ.  The Court should exclude evidence and arguments along those lines because NPC's duty to warn was limited to the physicians who prescribed Zometa® to Mrs. Guenther (Dr. Atkins and Dr. Simon) and NPC had no duty to warn Mrs. Guenther's dental care providers or Mrs. Guenther.

Regardless of whether this Court applies Georgia or Florida law to plaintiffs' remaining claims, the learned intermediary doctrine limits the scope of NPC's duty to warn. The learned intermediary doctrine does not require a company that manufactures or sells a prescription drug to provide direct warnings to patients.[18]  Under Georgia law, a pharmaceutical company is required to provide warnings about its drug only to prescribing physicians:  "[W]here prescription drugs are concerned, the manufacturer's duty to warn is limited to an obligation to advise the prescribing physician of any potential dangers that may result from the drug's use."  *Bryant v. Hoffmann-La Roche, Inc.*, 585 S.E.2d 723, 730 (Ga.

---

[18] *See, e.g.*, *McCombs v. Synthes (U.S.A.)*, 587 S.E.2d 594, 595 (Ga. 2003) (no duty to warn patients); *Felix v. Hoffman-LaRoche*, 540 So. 2d 102, 104 (Fla. 1989) (same; Florida law).

App. 2003) (brackets in original; quotation marks omitted).[19]  Likewise, under Florida law,

NPC only had a duty to warn physicians who prescribe Zometa® and was not required to

warn dental care providers.  As the Florida Supreme Court held in a pharmaceutical products

liability lawsuit:  "[I]t is clear that the manufacturer's duty to warn of [the prescription

drug's] dangerous side effects was directed to the physician rather than the patient.  This is so

because the ***prescribing physician***, acting as a 'learned intermediary' between the

manufacturer and the consumer, weighs the potential benefits against the dangers in deciding

whether to recommend the drug to meet the patient's needs."  *Felix*, 540 So. 2d at 104

(emphasis added; citations omitted).  Thus, "the duty of a drug manufacturer to warn of the

dangers involved in the use of a drug is satisfied if it gives an adequate warning to the

physician who prescribes the drug."  *Hoffman-La Roche Inc. v. Mason*, 27 So. 3d 75, 77 (Fla.

Dist. Ct. App. 2009).[20]

In sum, any suggestion that NPC had a duty to warn Mrs. Guenther's dental care

providers (or Mrs. Guenther directly) is contrary to the learned intermediary doctrine.

Therefore, the Court should preclude such evidence and arguments as irrelevant or, in the

alternative, as unfairly prejudicial to NPC and confusing to the jury, Rule 403.

C.  Promotional Materials Not Seen and Relied on by Dr. Atkins

NPC expects that plaintiffs will try to present evidence and arguments about

---

[19] *See also Eberhart v. NPC*, 867 F. Supp. 2d 1241, 1254 (N.D. Ga. 2011) ("Prescription drug manufacturers have a duty in Georgia to warn prescribing physicians, not patients, of the dangers involved with the product, because the physician serves as a learned intermediary between the manufacturer and patient.").

[20] *See Guarino v. Wyeth, LLC*, No. 12-13263, --- F.3d ---, 2013 WL 3185084, at *4 (11th Cir. June 25, 2013) (stating that "the prescribing physician . . . act[s] as a learned intermediary between the [prescription drug] manufacturer and consumer of the drug" and that "pharmaceutical manufacturers discharge their duty to warn the learned intermediary by way of a package insert" (quotation marks omitted)).

promotional materials that were directed to oncologists and provided information about Zometa®.  However, such evidence and arguments must be excluded because there is no evidence that Mrs. Guenther's prescribing oncologist, Dr. Atkins, ever saw and relied upon such promotional materials when deciding to prescribe Zometa® to Mrs. Guenther.

In cases involving the learned intermediary doctrine, promotional materials are inadmissible if the prescribing physician did not see and rely on such materials when deciding whether to prescribe the drug to the plaintiff.  In the *Seroquel* litigation, this Court considered whether to allow plaintiffs to introduce evidence about prescription drug promotional materials over defendant's objection that the evidence was irrelevant "because there is no evidence [that] the promotional pieces were actually seen by Plaintiffs' prescribing physicians."  *In re Seroquel Prods. Liab. Litig.*, No. 6:06-md-1769-Orl-22, 2009 WL 223140, at *4 (M.D. Fla. Jan. 30, 2009).  Evidence about defendant's promotional materials was excluded because plaintiffs did "not show[] that their prescribing physicians were exposed to the promotional materials."  *Id*. at *5.  Other federal courts have made similar exclusion rulings in lawsuits involving prescribing physicians who did not see and rely on a defendant's promotional materials.[21]

Here, there is no evidence that Dr. Atkins saw and relied on any NPC promotional materials when deciding to prescribe Zometa® to Mrs. Guenther.  Because plaintiffs cannot establish the necessary nexus between promotional materials and Dr. Atkins' prescribing

---

[21] *See Johnson v. Wyeth LLC*, No. CV 10-02690-PHX-FJM, 2012 WL 1150857, at *3 n.2 (D. Ariz. Apr. 5, 2012); *In re Norplant Contraceptive Prods. Liab. Litig*. No. MDL 1038, 1997 WL 81092, at *1 (E.D. Tex. Feb. 21, 1997) ; *see also Miller v. Pfizer, Inc*., 196 F. Supp. 2d 1095, 1123 n.92 (D. Kan. 2002) (stating that court previously granted motion *in limine* to exclude marketing material not relied on by prescribing physician), *aff'd*, 356 F.3d 1326 (10th Cir. 2004).

decision, the Court should exclude evidence and arguments about promotional materials as irrelevant or, in the alternative, as inadmissible under Rule 403.

The same exclusion ruling should apply to evidence and arguments about the "Physicians' Desk Reference" ("PDR").  The PDR is a collection of package inserts that physicians sometimes consult when they want to review a package insert for a particular drug.  There is no evidence that Dr. Atkins reviewed the Zometa® PDR entry, let alone that she relied on it when making her prescribing decision.  Thus, evidence and arguments about the PDR should be excluded as irrelevant or, in the alternative, under Rule 403.

    D.  <u>Alleged Duty to Warn Beyond Including Warnings in Zometa® Package Insert</u>

Based on past trial experience, NPC expects that plaintiffs will contend that NPC should have warned about ONJ in various ways beyond the Zometa® package insert itself, including putting warnings in promotional materials; warning health care providers through the PDR; and/or sending NPC sales representatives to warn health care providers directly and ensure that they were aware of ONJ-related revisions to the Zometa® package insert.  But, as the Eleventh Circuit stated recently in a drug products liability case:  "'Pharmaceutical manufacturers discharge their duty to warn the learned intermediary by way of a ***package insert*** which accompanies [their products].'"  *Guarino*, 2013 WL 3185084, at *4 (emphasis added) (quoting *E.R. Squibb & Sons, Inc. v. Farnes*, 697 So. 2d 825, 827 (Fla. 1997)).[22] Moreover, the Eleventh Circuit rejected the argument that the defendant should be held

---

[22] Although *Guarino* addresses the learned intermediary doctrine based on Florida law, this Eleventh Circuit ruling applies as well to this case if this Court holds that Georgia law governs plaintiffs' remaining claims.  The learned intermediary doctrine is firmly entrenched in the law of both states, and NPC is not aware of any difference between those states' laws regarding the learned intermediary doctrine that would render the reasoning and holding in *Guarino* inapplicable if Georgia law applies to plaintiffs' remaining claims.

"liable for failing to make medical providers aware of – i.e., failing to *communicate* – the change in labeling." *Id*. at *2.  The Zometa® package insert is the only place that NPC was required to give a warning about ONJ.  Therefore, plaintiffs should be precluded from making these other "failure-to-communicate" arguments in this case.

## IV.     Certain Labeling Revisions Are Inadmissible Subsequent Remedial Measures

NPC expects that plaintiffs will try to present evidence and arguments about revisions made to the Zometa® package insert in 2007 or later – well after Mrs. Guenther had been diagnosed with ONJ and had stopped her Zometa® therapy.  However, such labeling revisions are inadmissible subsequent remedial measures.  *See* Fed. R. Evid. 407; *Hughes v. Stryker Corp.*, 423 F. App'x 878, 880-81 (11th Cir. 2011).  Federal courts presiding over other Zometa® cases repeatedly have excluded evidence of labeling changes as subsequent remedial measures under Rule 407.[23]  This Court should do so as well.

Dated:  July 29, 2013                                      Respectfully submitted,


Michael J. Thomas                                    /s/ Donald W. Fowler
(mike@penningtonlaw.com)                   Donald W. Fowler (admitted *pro hac vice*)
Florida Bar No. 897760                          (dfowler@hollingsworthllp.com)
   PENNINGTON, P.A.                             Martin C. Calhoun (admitted *pro hac vice*)
   215 South Monroe St., 2nd Floor        (mcalhoun@hollingsworthllp.com)
   Tallahassee, FL 32301                            HOLLINGSWORTH LLP
   (850) 222-3533                                       1350 I Street, NW
   (850) 222-2126 (fax)                              Washington, D.C. 20005
                                                                   (202) 898-5800
                                                                   (202) 682-1639 (fax)

*Attorneys for Defendant Novartis Pharmaceuticals Corporation*

---

[23] *See, e.g.*, *Chiles*, slip op. at 6-8 (Ex. 10); *Brown v. NPC*, No. 7:08-CV-130-FL, 2012 WL 3066588, at *14 (E.D.N.C. July 27, 2012); *Mahaney ex. rel. Kyle v. NPC*, 835 F. Supp. 2d 299, 314 (W.D. Ky. 2011); *Hogan v. NPC*, No. 06 CIV. 0260 BMC RER, 2011 WL 1336566, at *2-4 (E.D.N.Y. Apr. 6, 2011).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have on this 29th day of July 2013 served a true and correct copy of

the foregoing motion and supporting memorandum of law, by operation of the Court's Electronic

Case Filing System, on the following:

John J. Vecchione, Esq.
Valad & Vecchione, PLLC
3863 Plaza Drive, Suite 200
Fairfax, VA  22030
(703) 352-4800

Ramon A. Rasco, Esq.
Podhurst Orseck, P.A.
City National Bank Building
25 West Flagler Street, Suite 800
Miami, FL  33130
(305) 358-2800

/s/ Donald W. Fowler
Donald W. Fowler (admitted *pro hac vice*)
(dfowler@hollingsworthllp.com)
Martin C. Calhoun (admitted *pro hac vice*)
(mcalhoun@hollingsworthllp.com)
  HOLLINGSWORTH LLP
  1350 I Street, NW
  Washington, D.C. 20005
  (202) 898-5800
  (202) 682-1639 (fax)

*Attorneys for Defendant Novartis*
*Pharmaceuticals Corporation*